MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2014 ME 68
Docket:       Yor-13-330
Argued:       April 9, 2014
Decided:      May 20, 2014

Panel:        SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

STATE OF MAINE

v.

THOMAS D. JOHNSON

MEAD, J.

[¶1]   Thomas D. Johnson's trial in May 2013 on a charge of domestic violence assault (Class C), 17-A M.R.S. § 207-A(1)(B)(3) (2013), ended when the trial court (*O'Neil, J.*) found manifest necessity to declare a mistrial and then ruled that the State would be allowed to retry Johnson. Asserting the double jeopardy clauses of the United States and Maine Constitutions, Johnson appeals from the court's order denying his motion to reconsider the ruling that he may be retried.[1] We affirm the order.

I.  BACKGROUND

[¶2]   An indictment returned by the York County Grand Jury on December 5, 2012, charged Johnson with assaulting the victim on September 12, 2012.   Johnson requested automatic discovery from the State

---

[1]  This interlocutory appeal does not violate the final judgment rule because "a pretrial order denying a motion to dismiss based on grounds of double jeopardy is immediately appealable." *State v. Chase*, 2000 ME 114, ¶ 1 n.1, 754 A.2d 961.

2

pursuant to M.R. Crim. P. 16(a), and discovery available by request pursuant to M.R. Crim. P. 16(b). The case went to trial on May 14, 2013, five months after the indictment was returned.

[¶3] After the jury was seated in the jury box on the morning that the trial began, the prosecutor requested a sidebar conference. He advised the court that he had spoken with the victim that morning for the first time. He reported that she gave him information that he had not known before, including that (1) during the assault Johnson held a knife to her throat and said, "I'll slash your fucking throat"; and (2) she had written a statement for the police two or three weeks after the incident. The prosecutor said that he had not known that the written statement existed, did not have it, did not know what was in it, and presumed that the Biddeford Police Department had it. He acknowledged that the new information differed from what had been provided to Johnson in discovery. Johnson's counsel told the court that "if this stuff, in fact, exists, I ask that this case be dismissed on an outrageous discovery violation."

With the jury waiting, the court ruled that

[y]ou [the prosecutor] can call your first witness. And the case isn't going to be dismissed. Oral statement of the knife is out as a discovery violation. With respect to the written statement, we will take that up when we get it here from the police. And I'll address what sanction, if any, should be imposed.

[¶4]   At the court's direction, the State proceeded to give its opening statement.  In describing the assault to the jury, the prosecutor said that Johnson "turns violent, physically violent.  He grabs [the victim] by the front of her hair . . . on the top of her head, takes her head and hits it against the counter."  This "head-banging incident" had not been discussed at sidebar before the State gave its opening statement.  Immediately after the State's opening concluded, defense counsel approached sidebar and objected:

> Judge, I'm going to object to the State's entire opening argument and here is why: [w]e heard [that] . . . my client hits [the victim's] head against the counter; never mention[ed] anywhere in any discovery [or] in any report. . . . taking this outrageous thing about the head banging down on the counter, that was not given in the discovery.

The following exchange then occurred:

> STATE:  That is what the witness told me this morning, your Honor. I have no idea what is in her written statement.  I assume it is contained in there.  But that is what the witness told me when I interviewed her this morning.  She will testify to that this morning.

> DEFENDANT:  . . . He is going to have her testify to stuff that he [] knows that we have not heard about and have never been provided any information about.  And for the State to wait until the morning of trial to do their interview of the victim and find out all of this . . . is not excusable, Judge.  This is terrible trial prep and it prejudices my client beyond belief.

> STATE:  It is trial prep that exists. . . . I can't force somebody to come . . . and speak with me.  I can only put them under subpoena if she didn't want to speak with me. . . . [Defense counsel], I'm sure, will be able to impeach her with it when she is on the stand.

4

> COURT: . . . With respect to the issue about the head-banging, I mean, I don't know what the discovery says so I'm not in a position at this point to issue a ruling . . . . I'll take it under advisement.

[¶5]  Johnson then gave his opening statement without referring to the head-banging incident, following which the court took a recess. After the jury retired, the court conferred with counsel regarding the victim's written statement that the prosecutor had by then received from the Biddeford Police Department. The court noted that it

> includes statements made, such as: "Shut up, Bitch, I'm going to cut your throat," and "I will kill you when I get out," and an allegation essentially for the first time today that in addition to pulling of hair there was smashing of the face on the sideboard in the kitchen.

Defense counsel, noting that the statement was dated December 18, 2012, five months before the trial, requested a dismissal based on the discovery violation and the resulting prejudice to Johnson. He concluded his argument by saying,

> I think the prejudice to my client at this stage cannot be overcome by the Court asking this jury to disregard the State's opening statement, which is based almost entirely not on the discovery that we have but on this statement that we didn't have. And it can't be corrected, Judge. I ask for a mistrial.

[¶6]  In opposing a dismissal, the prosecutor agreed that the written statement had been in the possession of the Biddeford Police Department for months and that it had first been produced that morning. He advised the court that the victim had appeared for trial only because she had been subpoenaed, not

because she was cooperating with the State. Defense counsel again objected to continuing with the trial, saying, "I think that this is absolutely the [kind of] case . . . that should be dismissed," and that, "I seriously think that I deserve a mistrial because the jury has been prejudiced beyond my ability to repair it." The court took "the mistrial issue and the dismissal issue" under advisement after sanctioning the State for the discovery violation by excluding both the victim's written statement and the substantive disclosures that she made to the prosecutor that morning, ruling that, "The State will be limited to the evidence that's produced in the original discovery involving the mechanism of assault here[.]" It then took a recess to allow the State to determine the reason that the written statement had not been produced earlier and to report that reason to the court.

[¶7] Following a discussion in chambers, the court revisited the question of how to proceed after defense counsel again requested a mistrial, asserting that he had no way to cure the prosecutor's reference in his opening statement to the head-banging incident. The court found that (1) the prosecutor had received the victim's written statement that day because the Biddeford Police Department had not logged it in at the time it was filed; (2) the failure to provide the statement in discovery had prejudiced Johnson; (3) in making his opening statement, the prosecutor had complied with the court's ruling excluding evidence of the alleged threat Johnson made with a knife; (4) the court had not yet excluded evidence of

6

the head-banging incident when the prosecutor referenced it in his opening; and (5) defense counsel was correct in arguing that there was no way to "unring the bell" concerning the head-banging incident because the jury had been told about it. The court ruled that it would "accordingly, grant the defendant's motion for a mistrial."

[¶8]  The court then turned to the issue of whether the mistrial resulted from manifest necessity and found that it did, reasoning that Johnson could not get a fair trial as a result of the late discovery, and that the State could not get a fair trial because of "the Court's ruling on the discovery issues, requiring the State to sanitize its version of events."  Finally, in determining whether the State would be allowed to retry Johnson, the court considered the question of whether the mistrial involved prosecutorial misconduct:

> The Court does not conclude that there was prosecutorial misconduct here.  That issue may have been different had I ruled before [the prosecutor's] opening statement that he couldn't use the bashed-the-face-into-the-sideboard theory of liability, but I didn't do that.  And [the prosecutor] was respectful of the Court's rulings and did not mention the oral statements that had been excluded.  So I cannot conclude that there is any prosecutorial misconduct.  Accordingly, the State would be entitled to retry its case.

Johnson, "disagree[ing] with the manifest necessity piece," preserved his objection to the court's ruling that he could be retried.

[¶9]  Two days later, Johnson filed a motion asking the court to reconsider its ruling and requesting a dismissal of the indictment on the ground that a retrial would violate his constitutional double jeopardy protections.  At a hearing on the motion, Johnson argued that a retrial should not be allowed because the State was wholly responsible for the circumstances leading to the mistrial.  The court reviewed the events that occurred at trial, reiterated its conclusion that the discovery violation resulted from the inaction of the Biddeford Police Department, and denied the motion.  This appeal followed.

## II.  DISCUSSION

[¶10]  Because the double jeopardy clauses of the United States and Maine Constitutions protect a criminal defendant "against being twice put in jeopardy of life or limb for the same offense," *State v. Chase*, 2000 ME 114, ¶ 6, 754 A.2d 961 (quotation marks omitted), once the jury is sworn and jeopardy attaches, a defendant "will not be required to stand trial a second time unless he consents to a mistrial . . . or unless under all the circumstances, the mistrial was mandated by manifest necessity."  *State v. Rowe*, 480 A.2d 778, 781 (Me. 1984) (citations omitted).

[¶11]  As discussed above, Johnson strenuously objected several times to the trial continuing past opening statements.  Sometimes his requests were for a dismissal, other times for a mistrial.  His final argument to the court—that he could

not "unring the bell" after the State's opening statement—concluded with "[a]nd that's really the basis for my . . . request for the mistrial." Whatever the term used, it is clear that Johnson did not want the trial to move forward. After the court "grant[ed] the defendant's motion for a mistrial," defense counsel, although he "disagreed with the manifest necessity piece," agreed that "under the circumstance I think that your ruling, as far as getting rid of the trial today, is, in fact, the only thing that we can do."

[¶12] We recently said that "[t]he defendant's consent to mistrial or conduct constituting implied consent . . . eliminates any barrier to retrial under the double jeopardy clause, barring intentional prosecutorial misconduct." *State v. Carey*, 2013 ME 83, ¶ 21, 77 A.3d 471. By consenting to not "hav[ing] his trial completed by a particular tribunal once jeopardy attach[ed]," *Rowe*, 480 A.2d at 782, Johnson removed any double jeopardy barrier to a retrial so long as the court was correct in finding that intentional prosecutorial misconduct did not impose a constitutional bar. For that reason, we do not reach the trial court's determination that a mistrial was manifestly necessary. *See Carey*, 2013 ME 83, ¶ 20, 77 A.3d 471 ("[I]n this case we need not reach the issue of manifest necessity. We affirm the declaration of a mistrial on the alternate grounds that [the defendant] impliedly consented to the entry of a mistrial.").

[¶13] Because we conclude that Johnson consented to a mistrial, we next consider whether intentional prosecutorial misconduct nonetheless bars a retrial. *See id.* ¶ 21; *Chase,* 2000 ME 114, ¶ 6, 754 A.2d 961. In order for the State's actions to preclude it from a second trial,

> the prosecutorial misconduct must rise to an egregious level for double jeopardy to bar a retrial. A defendant cannot be retried *only where the conduct of the prosecutor is undertaken . . . to prevent an acquittal that [the prosecutor] believed at the time was likely to occur in the absence of his misconduct.* We will not upset a trial court's factual determination that there was no intentional prosecutorial misconduct unless the finding is clearly erroneous.

*Chase,* 2000 ME 114, ¶¶ 6-7, 754 A.2d 961 (citations omitted) (emphasis in original). In *Chase,* we declined the defendant's invitation to substitute a lower "inexcusable negligence" standard for the "intentional prosecutorial misconduct" standard. *Id.* ¶ 6 n.3.

[¶14] Here, the trial court explicitly found that no prosecutorial misconduct occurred. We defer to that finding because "the trial court . . . was in the best position to view the course in which the trial was moving and the conduct of counsel." *Id.* ¶ 7. Johnson argues that the underlying reason for the mistrial is chargeable to the State—essentially urging us to apply the "inexcusable negligence" standard that we rejected in *Chase*—but does not contend that the prosecutor's actions were "intended to force a mistrial and prevent an impending acquittal." *Id.* ¶¶ 6 n.3, 8. The court's finding that prosecutorial misconduct rising

to that level did not occur was not clearly erroneous. *See id.* ¶ 7. As we did in *Chase*, we again decline the invitation to change the applicable test.

[¶15] Johnson finally contends that our decision in *State v. Rowe* requires that the indictment be dismissed. In *Rowe*, we said that "[t]he State cannot rely on a problem created by its own neglect to establish the existence of manifest necessity." 480 A.2d at 783. For two reasons, *Rowe* is not controlling here. First, it is inapplicable because Johnson consented to the mistrial, and so we do not reach the issue of whether a mistrial was also justified by manifest necessity. *See Chase*, 2000 ME 114, ¶ 6, 754 A.2d 961 ("A motion by the defendant for mistrial . . . is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." (quotation marks omitted)).

[¶16] Second, if we were to reach that issue, the mistrial in *Rowe* was directly precipitated by the State's negligence—the State created what it should have foreseen as a *Bruton* problem[2] at an early stage in the case, and then failed to correct it until the trial was well underway and it was too late. *Rowe*, 480 A.2d at 783. Here, because the police are the equivalent of the prosecutor for purposes of the discovery rules, the State was negligent in failing to provide the victim's

---

[2] As we explained in *Rowe*: "*Bruton* [*v. United States*] holds that in joint trial cases, the admission in evidence of a non-testifying defendant's confession implicating his codefendant violates the codefendant's Sixth Amendment right to cross-examine his accusers." *State v. Rowe*, 480 A.2d 778, 780 n.4 (Me. 1984) (citing *Bruton v. United States*, 391 U.S. 123, 137 (1968)).

written statement in discovery before the trial. *See* M.R. Crim. P. 16(b)(1). The event directly precipitating the mistrial was not the State's negligence in providing late discovery, however, but rather the prosecutor's reference to the head-banging incident—which had not yet been excluded by the court—in his opening.

[¶17] At that point in the trial, the factual basis for the head-banging reference was not the victim's written statement, but rather the prosecutor's discussion with the victim that morning. Johnson seeks to conflate the victim's written statement with her oral statements because they eventually proved to contain the same information, but he fails to recognize the critical difference in their origin. A victim's written statement in the State's possession that is not provided to the defense is properly excluded as a discovery violation, but it is neither improper nor particularly unusual in a domestic violence case for a prosecutor to interview a victim on the day of the trial after the victim appears only in compliance with a subpoena. Notwithstanding Johnson's objection to what he considers to be the State's inadequate trial preparation, if the victim in this case had not given police a written statement at all and had only talked to the prosecutor on the morning of the trial, no discovery violation would be evident.[3]

---

[3] In hindsight, before giving his opening statement the prosecutor would have been well advised to obtain a ruling from the court as to the admissibility of the victim's oral statement concerning the head-banging incident, as he did concerning the knife-threatening incident. Nevertheless, we defer to the court's determination that the prosecutor was "respectful" of its rulings and that no prosecutorial misconduct occurred.

12

[¶18]  The court found that the State's opening was made in good faith because the prosecutor avoided discussing issues that the court had excluded, and evidence of the head-banging incident was excluded only after both parties had opened and the late written statement became available.  Accordingly, there was not a direct causal connection between the State's negligence in failing to provide discovery and the problem causing the mistrial.  For that reason, *Rowe* is distinguishable.

The entry is:

> Order affirmed.

**On the briefs:**

Clifford B. Strike, Esq., Strike, Goodwin & O'Brien, Portland, for appellant Thomas D. Johnson

Kathryn Loftus Slattery, District Attorney, and Anne Marie Pazar, Esq., Prosecutorial District No.1, Alfred, for appellee State of Maine

We also do not suggest that a discovery violation resulting from the State's failure to provide a written statement in a timely manner can be cured simply by having a witness orally repeat on the morning of trial what the written statement says.  Here, because they contained the same substantive information, the court excluded both the victim's written and last-minute oral statements.  Had it been able to do so before the parties opened, there would have been no mistrial, and the State would have been required to present its case-in-chief without using any of the challenged statements.

**At oral argument:**

Clifford B. Strike, Esq. for appellant Thomas Douglas Johnson

Anne Marie Pazar, Esq., for appellee State of Maine

York County Superior Court docket number CR-2012-1870
FOR CLERK REFERENCE ONLY